**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **SARA CARTER and GEORGIACARRY.ORG, INC.,** | **CIVIL ACTION FILE** |
| **Plaintiffs,** | **No. 1:20-CV-1517-SCJ** |
| **v.** | |
| **BRIAN KEMP, individually and in his official capacity as Governor of The State of Georgia, and PINKIE TOOMER, individually and in her official capacity as Judge of The Probate Court of Fulton County, Georgia,** | |
| **Defendants.** | |

## <u>ORDER</u>

This matter appears before the Court on Plaintiffs' Motion for Temporary Restraining Order ("TRO") (Doc. No. [3]). Plaintiffs argue that the suspension of processing Georgia Weapons License ("GWL") applications during the pendency of the current emergency violates their Second and Fourteenth Amendment rights. Plaintiffs now seek an order enjoining enforcement of O.C.G.A. § 16-11-

126 during the pendency of this case, or at least until the current state of emergency has abated. Doc. No. [3-1], p. 1.

## I.     BACKGROUND

### A.  <u>GWL Requirements</u>

Georgia law does not require a GWL to possess a firearm in one's home, car, or place of business. O.C.G.A. § 16-11-126(a). In addition, unlicensed individuals may also carry in public (1) an unloaded or loaded long gun, provided any loaded long gun is carried openly, or (2) any handgun, provided it is enclosed in a case and unloaded. O.C.G.A. § 16-11-126(b), (c). Any person with a valid hunting or fishing license on his or her person, who is engaged in legal hunting, fishing, or sport shooting may carry a firearm without a GWL, provided the person has the permission of the owner of the land on which the activities are being conducted. O.C.G.A. § 16-11-126(f)(1). Individuals wishing to carry firearms beyond the exceptions listed in O.C.G.A. § 16-11-126(a)–(g) must obtain a GWL. O.C.G.A. § 16-11-126(h)(1). Failure to do so constitutes the offense of carrying a weapon without a license. O.C.G.A. § 16-11-126(h)(2).

State probate judges are statutorily tasked with processing and issuing GWLs. <u>See</u> O.C.G.A. § 16–11–129(a)(1). The statute requires probate judges to

2

duly investigate each applicant before issuing a GWL to ensure they are qualified. See O.C.G.A. § 16–11–129(b), (c). As part of this investigation, "the judge of the probate court shall require the applicant to proceed to an appropriate law enforcement agency in the county or to any vendor approved by the Georgia Bureau of Investigation" to be fingerprinted. O.C.G.A. § 16–11–129(c).

## B. COVID-19 Emergency

On March 14, 2020, Governor Kemp declared a public health state of emergency due to the rapid spread of COVID-19. See Georgia Exec. Order 03.14.20.01 (March 14, 2020), https://gov.georgia.gov/document/2020-executive-order/03142001/download. The same day, Chief Justice Harold Melton of the Supreme Court of Georgia declared a state of judicial emergency. Doc. No. [28-6]. These declarations were "based on the continued transmission of COVID-19 throughout the State of Georgia in an effort to protect the health, safety, and welfare of all Georgia citizens and visitors." Doc. No. [33], p. 2.

Chief Justice Melton's order stated:

> To the extent feasible, courts should remain open to address essential functions, and in particular courts should give priority to matters necessary to protect health, safety, and liberty of individuals. Essential functions are subject to interpretation; however, some matters that fall into the essential function category are:

3

> (1) where an immediate liberty or safety concern is present requiring the attention of the court as soon as the court is available; (2) criminal court search warrants, arrest warrants, initial appearances, and bond reviews; (3) domestic abuse temporary protective orders and restraining orders; (4) juvenile court delinquency detention hearings and emergency removal matters; and (5) mental health commitment hearings.

Doc. No. [26], p. 10. "To the extent court proceedings are held, they should be done in a manner to limit the risk of exposure, such as by videoconferencing, where possible." Id. at 11. In March of 2020, the Judicial Qualifications Commission ("JQC") issued a statement noting that any judge who failed to follow the Chief Justice's order could be subject to JQC action. Id. at 14.

On March 17, 2020, the Council of Probate Court Judges of Georgia ("the Council") issued a memorandum clarifying the effect of Chief Justice Melton's order on the state's probate courts. Doc. No. [26], pp. 16–17. The memorandum explicitly listed the issuance of GWLs as a non-essential function. Id. at 17. The memorandum also noted that Chief Justice Melton's order extended the deadline for renewals of existing GWLs, meaning GWLs set to expire during the pendency of the emergency will remain valid until the declaration of emergency is lifted. Id.

4

In light of the Chief Justice's declaration, the JQC statement, and the Council's memorandum, Defendant Judge Toomer determined that the suspension of processing applications for GWLs, until further notice, was appropriate. Doc. No. [26], p. 8. This decision was also based on a "lack of law enforcement agencies under contract with the Probate Court conducting fingerprinting,"[1] as well as "the health and safety of [Judge Toomer's] staff and the citizens of Fulton County." Doc. No. [32], p. 3.

## C. Procedural History

Plaintiffs Sara Carter and GeorgiaCarry.Org ("GCO") filed this action on April 9, 2020 alleging violations of the Second Amendment, Fourteenth Amendment, and related state constitutional provisions. Doc. No. [1], p. 1, ¶ 1. Plaintiffs brought this action against Defendant Judge Toomer individually and in her official capacity as Judge of the Fulton County Probate Court, and against

---

[1]     During the April 15, 2020 TRO hearing, Judge Toomer's counsel stated that none of the approved fingerprinting entities with which Fulton County contracts are providing fingerprinting services at this time, due to the pandemic. Doc. No. [34], Tr. 38:22–39:3. Counsel also noted that there is no evidence in the record that any approved entities are currently conducting fingerprinting services. Id. at 40:12–19. Plaintiffs addressed this contention in their post-hearing brief, arguing that there are in fact approved entities conducting "contactless" fingerprinting in Fulton County at this time. See Doc. No. [31], pp. 7–8.

Defendant Governor Kemp individually and in his official capacity as Governor of the state of Georgia.[2]

Plaintiffs argue that "[b]y requiring a GWL in order to exercise a fundamental constitutional right, but making it a sheer impossibility to obtain a GWL, [Defendants] are violating [Plaintiff] Carter's right to due process and 42 U.S.C. § 1983 and the Georgia Constitution." Doc. No. [1], p. 6, ¶ 43. Plaintiffs allege that without a GWL, Plaintiff Carter could be charged with a misdemeanor pursuant to O.C.G.A. § 16-11-126. Id. ¶ 25. The Court held a hearing on Plaintiffs' TRO Motion via teleconference on April 15, 2020. See Doc. No. [34] (Hearing Transcript).

Though the Complaint seeks, *inter alia*, "a writ of mandamus under O.C.G.A. § 16-11-129 ordering [Judge] Toomer in her official capacity to accept and process [Plaintiff] Carter's application for a GWL and to issue [Plaintiff]

---

[2]    Plaintiffs amended their Complaint to clarify that, to the extent they pled claims for injunctive and declaratory relief against Governor Kemp in his *individual* capacity, this was error. Doc. No. [23], p. 1. Thus, they amended their Complaint by "restating the complaint in its entirety, but amending paragraphs 51 and 52 to seek declaratory and injunctive relief against Kemp in his *official* capacity." Id. (emphasis in original). The Complaint still seeks "[c]osts and attorney's fees against Toomer and Kemp in their individual capacities pursuant to 42 U.S.C. § 1988." Doc. No. [1], p. 8, ¶ 53.

Carter a GWL within the time required by law," id. ¶ 48, Plaintiffs' counsel clarified at the April 15, 2020 hearing that no relief against Judge Toomer is sought at this time.[3] Doc. No. [34], Tr. 17:16–18. Rather, in their motion for TRO, Plaintiffs seek (1) a declaration against Governor Kemp that the enforcement of O.C.G.A. § 16-11-126 is unconstitutional as applied, and (2) "an order enjoining enforcement of O.C.G.A. § 16-11-126 during the pendency of this case, or at least until the current state of emergency has abated." Doc. No. [3-1], p. 1.

Governor Kemp argues Plaintiffs' Motion for TRO should be denied for six reasons. Doc. No. [33], p. 6. First, he argues Plaintiffs lack standing to bring this action against him because they have suffered no concrete injury from any action traceable to him. Id. at 7–11. Second, he argues Plaintiffs' claims against him are barred by the Eleventh Amendment and do not fit within the *Ex Parte* Young exception to the immunity bar. Id. at 11 –14. Third, Governor Kemp argues that he can "neither require nor prevent any member of the state judiciary from performance of their duties." Id. at 14–17. Fourth, he argues Plaintiffs cannot establish a violation of the Fourteenth Amendment. Id. at 17–22. Fifth, he argues

---

[3]     Because no relief is sought against Judge Toomer in the TRO motion, her arguments will not be addressed in this Order.

Plaintiffs cannot show that they will suffer an irreparable injury in the absence of the relief requested. Id. at 22–23. Finally, he asserts the damages of the proposed injunction outweigh any risk of injury to Plaintiffs, and an injunction would be adverse to the public interest. Id. at 23–24.

## II.     THRESHOLD ISSUES

### A. <u>Standing</u>

In response to Plaintiffs' TRO motion, Governor Kemp argues that Plaintiffs lack standing to bring their claims against him. Doc. No. [33], p. 7. More specifically, Governor Kemp contends that Plaintiffs have suffered no concrete injury which arises from any action taken by him. Id.

### 1.     *Applicable Legal Standard*

"Standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" <u>CAMP Legal Def. Fund, Inc. v. City of Atlanta</u>, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 499 (1975)). Article III of the United States Constitution limits the courts to hearing actual "Cases" and "Controversies." U.S. Const. Art. III § 2; <u>see also</u> <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 559–60 (1992). Overall, the standing requirement arising out of Article III seeks to uphold separation-of-powers

principles and "to prevent the judicial process from being used to usurp the powers of the political branches." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013). Standing is typically determined by analyzing the plaintiff's situation as of the time the complaint is filed, and subsequent events do not alter standing. Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1275 (11th Cir. 2003) (collecting authorities); Johnson v. Bd. of Regents of Univ. of Ga., 263 11 F.3d 1234, 1267 (11th Cir. 2001); Charles H. Wesley Educ. Found., Inc. v. Cox, 408 F.3d 1349, 1352 n.3 (11th Cir. 2005).

To establish standing, a plaintiff must show three things:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan, 504 U.S. at 560–61 (internal quotations, citations, and alterations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." Id. at 561.

9

### 2.    *Analysis*

Here, Governor Kemp asserts that Plaintiffs cannot demonstrate standing for two reasons. Doc. No. [33], p. 7. First, he argues that Plaintiffs cannot show that they will suffer an injury in fact. Id. Second, he argues that Plaintiffs cannot show a causal connection between a concrete injury and Governor Kemp's conduct. Id. The Court addresses each argument in turn.

### i.    <u>Injury in Fact</u>

Governor Kemp first asserts that Plaintiffs fail to demonstrate standing against him because they cannot show that they will suffer an injury in fact. Doc. No. [33], p. 8. More specifically, he argues that, during the pendency of this public health state of emergency, Plaintiff Carter's alleged fear of arrest or prosecution under O.C.G.A. § 16-11-126 if she carries a weapon outside her home, vehicle, or place of business without a GWL is "speculative and not reasonable in light of state law prohibiting law enforcement officers from detaining Plaintiff to inquire about her permit." Id.; O.C.G.A. § 16-11-137(b) ("A person carrying a weapon shall not be subject to detention for the sole purpose of investigating

whether such person has a [GWL].").[4] Consequently, Governor Kemp contends that Plaintiffs face no "credible threat of prosecution" under O.C.G.A. § 16-11-126 and thus cannot demonstrate that they will suffer an injury in fact. Id.

The injury-in-fact requirement ensures that persons involved in the litigation have a direct stake in its outcome. Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1340 (11th Cir. 2014). As such, the injury must be both particularized (affecting the plaintiff in a personal way) and concrete (actual as opposed to abstract). Spokeo, Inc. v. Robins, 578 U.S. ___, 136 S. Ct. 1540, 1548–49 (2016).

Moreover, a plaintiff "c[an] bring a pre-enforcement suit when he 'has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution.'" Wollschlaeger v. Governor, Fla., 848 F.3d 1293, 1304 (11th Cir. 2017) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014)). "[P]ersons having no fears of state prosecution except those that are imaginary

---

[4]     In support of this contention, Joan Crumpler, the Legal Director for the Georgia Department of Public Safety ("DPS"), avers that during the past two years, the DPS has only issued fourteen citations, to twelve individuals, for violations of O.C.G.A. § 16-11-126(h). See Doc. No. [22-1], ¶ 5. Furthermore, in each case, the underlying cause of the traffic stop was another criminal violation, and in each case, the individual cited was not eligible for a GWL because they were prohibited by law from carrying a weapon. Id. ¶¶ 7–8.

11

or speculative, are not to be accepted as appropriate plaintiffs in such cases."

Younger v. Harris, 401 U.S. 37, 42 (1971). When plaintiffs "do not claim that they

have ever been threatened with prosecution, that a prosecution is likely, or even

that a prosecution is remotely possible," they do not allege a dispute susceptible

to resolution by a federal court. Id.

Upon review, the Court finds that Plaintiffs have failed to articulate any

concrete injury. Namely, Plaintiff Carter's fear or arrest and prosecution under

O.C.G.A. § 16-11-126 during the pendency of this state of emergency is not

reasonable, especially considering state law prohibiting law enforcement officers

from detaining her solely to inquire about her GWL. O.C.G.A. § 16-11-137(b). Put

differently, unless law enforcement officers have a reasonable and articulable

suspicion to detain Plaintiff Carter for the violation of some other criminal statute,

arrest and subsequent prosecution under O.C.G.A. § 16-11-126 would not follow.[5]

Any other conclusion would require the Court to assume that police officers

---

[5]     Additionally, the Court *sua sponte* notes that O.C.G.A. § 16-11-138 provides an "absolute defense" to any violation under O.C.G.A. § 16-11-126 for "defense of self or others." O.C.G.A. § 16-11-138. In other words, O.C.G.A. § 16-11-138 affords a justification defense for the otherwise unlawful carrying of a weapon without a GWL when and to the extent that the accused reasonably believes that such carrying is necessary to defend themselves. See Johnson v. State, ___ Ga ___, ___ S.E.2d ___, 2020 WL 966592, at * 3 n.7.

would not follow the law, and Plaintiffs have cited no authority nor pled any facts to support such a conclusion.

Accordingly, the Court finds that Plaintiffs' generalized and speculative fear of being prosecuted for carrying a weapon without a GWL, and prior to the expiration of the state of emergency, is not sufficiently concrete to confer standing against Governor Kemp.

### ii.  Causal Connection

Governor Kemp further asserts that, even assuming Plaintiffs' fear of prosecution is more than speculative, they still cannot show a causal connection between a concrete injury and Governor Kemp's conduct. Doc. No. [33], p. 9. He contends that Plaintiffs' alleged injuries are not "fairly traceable" to his conduct as opposed to the action of a third party. Id. at pp. 9–10. More specifically, Governor Kemp characterizes the relief Plaintiffs seek in their TRO motion (i.e., temporarily enjoining the enforcement of O.C.G.A. § 16-11-126 during the pendency of this state of emergency)[6] as flowing from the probate judges'

---

[6]     As stated above, at the April 15, 2020 hearing, Plaintiffs confirmed that their TRO motion does not seek a writ of mandamus ordering the probate court to continue processing GWL applications. Doc. No. [34], Tr. 17:4–13.

decision to temporarily suspend processing GWL applications—not from any action taken by him. Id. at p. 10.

In their Complaint, Plaintiffs allege that Governor Kemp is the chief executive officer of the State of Georgia and conservator of the peace throughout the state, thereby making him obligated to ensure that the laws of Georgia are faithfully executed. Doc. No. [1], ¶¶ 8–9; see also Doc. No. [34], Tr. 19:23–20:4. Furthermore, at the April 15, 2020 hearing, Plaintiffs characterized the issuing of licenses as an executive function, not a judicial function.[7] Doc. No. [34], Tr. 15:9–23.

Nevertheless, for purposes of standing, Plaintiffs' Complaint still fails to point to any specific conduct or wrongdoing by Governor Kemp such that their alleged injuries can fairly be traced back to him. See Lewis v. Governor of Alabama, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc). Namely, Plaintiffs' grievances appear to be directed not at the license requirement under O.C.G.A. § 16-11-126 and statutory framework for obtaining a GWL, but rather at the current

---

[7]    To the extent that Plaintiffs raise these arguments in support of their contention that the federal claims against Governor Kemp fall within the _Ex Parte_ Young exception to Eleventh Amendment immunity, such arguments will be addressed _infra_ in the Eleventh Amendment section of this Order.

suspension of processing GWL applications during the pendency of this state of emergency. Doc. No. [1], ¶¶ 43, 46. Moreover, Governor Kemp's Executive Order does not expressly address the issuance of GWLs, and Plaintiffs fail to explain what exactly Governor Kemp "did wrong" and how exactly they can "trace their injuries to his 'conduct.'" <u>Lewis</u>, 944 F.3d at 1296.[8]

Accordingly, for purposes of the pending TRO motion, the Court finds that Plaintiffs have failed to demonstrate standing to pursue their claims against Governor Kemp.

### B. <u>Eleventh Amendment Sovereign Immunity</u>

A review of Plaintiffs' Complaint, *as amended*, shows that in Counts 1 and 2, Plaintiffs allege that Governor Kemp is violating the Georgia Constitution by "making it a sheer impossibility to obtain a GWL" and "effectively preventing Carter from carrying a handgun outside her home, motor vehicle, or place of

---

[8]   At the April 15, 2020 hearing, Plaintiffs raised a number of arguments that were not pled in the Complaint, namely that the license statute itself violates the Georgia Constitution by impermissibly delegating licensing authority to probate judges rather than the executive branch. Doc. No. [34], Tr. 15:9–23. Doc. No. [34], Tr. 15:9–23. "[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element."<u>Spokeo,</u> 136 S. Ct. at 1547. Because Plaintiffs' allegations concerning the vesting of licensing authority were not alleged in the Complaint, the Court declines to consider them in the standing analysis.

business." Doc. No. [1], ¶¶ 43, 46. In response to Plaintiffs' TRO motion, Governor Kemp asserts that Plaintiffs' claims against him based on violation of state law are barred by the Eleventh Amendment of the United States Constitution. Doc. No. [33], p. 6.

"The Eleventh Amendment prohibits a federal court from exercising jurisdiction over a lawsuit against a state [and its officers], except where the state has consented to be sued or waived its immunity, or where Congress has overridden the state's immunity." Cross v. Ala. State Dep't of Mental Health & Mental Retardation, 49 F.3d 1490, 1502 (11th Cir. 1995) (citations omitted); see U.S. Const. amend. XI ("[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . .").[9]

The United States Supreme Court has held that "a suit against state officials on the basis of state law contravenes the Eleventh Amendment." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117 (1984). The Court also indicated that

---

[9]   Eleventh Amendment immunity is a threshold issue that is "in the nature of a jurisdictional bar" to be decided early in the litigation. Bouchard Transp. Co. v. Fla. Dep't of Envtl. Prot., 91 F.3d 1445, 1448 (11th Cir. 1996).

when injunctive relief is sought, "an error of law by state officers acting in their official capacities will not suffice to override the sovereign immunity of the State where the relief effectively is against it." Id. at 113 (citations omitted). The Court further stated: "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Id. at 106.

In light of this authority, the Court agrees that the alleged violations of the Georgia State Constitution asserted against Governor Kemp in Counts 1 and 2 of Plaintiffs' Complaint, *as amended*, are barred by the Eleventh Amendment of the United States Constitution. See also Hand v. Scott, 888 F.3d 1206, 1213–14 (11th Cir. 2018) (holding that "the district court cannot enjoin [a state] to follow the district court's interpretation of [the state's] own constitution.").

As to the federal claims also alleged in Counts 1 and 2 of Plaintiffs' Complaint, Governor Kemp asserts that Plaintiffs' claims do not fit within the *Ex Parte* Young exception to Eleventh Amendment immunity. Doc. No. [33], p. 6. "Under the doctrine enunciated in *Ex Parte* Young, 209 U.S. 123 (1908) . . . a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis is not a suit against the state,

and, accordingly, does not violate the Eleventh Amendment." Grizzle v. Kemp, 634 F.3d 1314, 1319 (11th Cir. 2011) (citations omitted); see also Alden v. Maine, 527 U.S. 706, 756–57 (1999) ("The rule [of sovereign immunity], however, does not bar certain actions against state officers for injunctive or declaratory relief."), Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 n.10 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'"). The Supreme Court further held that "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act." *Ex Parte* Young, 209 U.S. at 157. "The required 'connection' is not 'merely the general duty to see that the laws of the state are implemented,' but 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" Morris v. Livingston, 739 F.3d 740, 746 (5th Cir. 2014) (citation omitted).

The Eleventh Circuit has stated that "[p]ersonal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity. All that is required is that the official be responsible for

the challenged action." Luckey v. Harris, 860 F.2d 1012, 1015 (11th Cir. 1988). In the Luckey case, the Eleventh Circuit concluded that because the Governor of the State of Georgia is responsible for law enforcement in the state, is charged with executing the laws faithfully, has residual power to commence criminal prosecutions, and has the final authority to direct the Attorney General to institute and prosecute on behalf of the state, he could be sued by indigent defendants for due process and other violations. Id. at 1016; see also GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1254 (11th Cir. 2012) (allowing a § 1983 lawsuit to proceed against governor due to his job to "ensure the enforcement of Georgia's statutes"); but see Osterback v. Scott, 782 F. App'x 856, 859 (11th Cir. 2019) (indicating that general executive responsibility is an insufficient connection to the enforcement of a statute to avoid the Eleventh Amendment).

In the Complaint, Plaintiff Carter attempts to connect Governor Kemp to her claim that "the enforcement of O.C.G.A. § 16-11-126 is unconstitutional as applied to" her based on Governor Kemp's status as the chief executive officer of the State of Georgia, the conservator of peace throughout the state, and the official obligated to take care that the laws are faithfully executed. Doc. No. [1],

19

¶¶ 8–9.[10] Under the Luckey and Georgia cases, Plaintiffs' federal claims could fit within the *Ex Parte* Young exception to Eleventh Amendment immunity and this Court accordingly declines to uphold Governor Kemp's arguments to the contrary for purposes of the pending TRO motion *only*.

In summary, the Court finds that the allegations in Counts 1 and 2 of the Complaint, *as amended* (concerning violations of the Constitution of the State of Georgia by Governor Kemp), are barred by the Eleventh Amendment of the United States Constitution. As to the federal claims (also in Counts 1 and 2 of Plaintiffs' Complaint), for purposes of the pending TRO *only*, the Court declines to uphold Governor Kemp's *Ex Parte* Young exception to Eleventh Amendment immunity arguments. [11]

---

[10]     As stated above, at the April 15, 2020 hearing, Plaintiffs raised a number of arguments that were not pled in the Complaint, namely that the license statute itself violates the Georgia Constitution by impermissibly delegating licensing authority to probate judges rather than the executive branch. Doc. No. [34], Tr. 15:9–23. It appears to the Court that the focus of the inquiry into whether a suit lies under *Ex Parte* Young is based on the allegations of the complaint. See generally Verizon Md. Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002) (citation omitted) (discussing the court's "straightforward inquiry" into the complaint) and League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 474 (6th Cir. 2008). Accordingly, as these allegations are not in the Complaint, the Court will not consider them for purposes of the present TRO motion.

[11]     The Court also notes that, where the gravamen of the complaint appears to be that the State improperly interpreted and failed to adhere to a state statute, Pennhurst

### III.   TRO STANDARD

The Court considers four factors when deciding whether to issue a TRO pursuant to Federal Rule of Civil Procedure 65: (1) whether there is a substantial likelihood of success on the merits; (2) whether the TRO is necessary to prevent irreparable injury; (3) whether the threatened injury outweighs the harm that the TRO would cause to the non-movant; and (4) whether the TRO would be adverse to the public interest. Parker v. State Bd. Of Pardons and Paroles, 275 F.3d 1032, 1034–35 (11th Cir. 2001). Injunctive relief is an extraordinary and drastic remedy and should not be granted unless the movant clearly establishes the burden of persuasion as to each of these four factors. Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000).

---

may bar any related federal claims. This is because, despite references to the United States Constitution in the pleadings, the claims necessarily rely on a determination that a state official has not complied with state law—a determination that is barred by sovereign immunity. See S&M Brands, Inc. v. Georgia ex rel. Carr, 925 F.3d 1198, 1205 (11th Cir. 2019) and DeKalb Cty. Sch. Dist. v. Schrenko, 109 F.3d 680, 688 (11th Cir. 1997). There is an argument that this case could fall within such authority; however, neither party has addressed this line of authority and the Court declines to issue a definitive ruling at this stage of the case.

## IV.   ANALYSIS

Despite having found that Plaintiffs lack standing to seek the requested injunctive relief against Governor Kemp, the Court will nonetheless address the four TRO factors as they apply to Plaintiffs' Second and Fourteenth Amendment claims. [12]

### A. Likelihood of Success on the Merits

For the following reasons, the Court finds that Plaintiffs have failed to show that they have an ultimate likelihood of success on the merits of their Second and Fourteenth Amendment claims.

#### 1.  *Second Amendment Claim*

Plaintiffs argue that "[b]ecause Georgia law requires a GWL to carry a handgun, and [Judge] Toomer refuses to issue a GWL," Plaintiff Carter and other members of GCO "have no meaningful way to carry handguns for self-defense, in violation of the Second Amendment." Doc. No. [3-1], p. 2. Thus, Plaintiffs argue, they are "completely precluded from exercising in any meaningful way

_____

[12]     While post-hearing, Governor Kemp withdrew his merits-based Second Amendment arguments (Doc. No. [33]), it is still proper for this Court to engage in such an analysis pursuant to the above-stated legal standard for review of TRO motions.

their Second Amendment rights in this time of turmoil and potential civil unrest." Id. at 2–3.

In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court held for the first time that the Second Amendment creates an individual right to keep and bear arms. [13] Heller clearly holds that laws banning "handgun possession in the home" are unconstitutional. See id. at 635 ("In sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."). As the Eleventh Circuit has noted, the Heller Court "went to great lengths to emphasize the special place that the home—an individual's private property—occupies in our society." GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1259 (11th Cir. 2012) (citing Heller, 554 U.S. at 628–29). However, Heller did not define the extent to which the Second Amendment may protect individuals seeking to carry firearms outside the home and in public.

---

[13]    McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010) later incorporated the Second Amendment against the states via the due process clause of the Fourteenth Amendment.

23

"Like most rights, the right secured by the Second Amendment is not unlimited." <u>United States v. Rozier</u>, 598 F.3d 768, 770 (11th Cir. 2010) (quoting <u>Heller</u>, 554 U.S. at 626). "It is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." <u>Heller</u>, 554 U.S. at 571. In fact, the <u>Heller</u> Court was careful to explain that

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626–27. The Court identified this as a "non-exhaustive" list of "presumptively lawful regulatory measures." <u>Id.</u> at 627 n. 26. Thus, in at least some circumstances, the state may constitutionally restrict an individual's ability to bear arms outside the home.

Like most circuits, the Eleventh Circuit has derived from <u>Heller</u> a "two-step inquiry" to address Second Amendment claims: "first, we ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we would apply the appropriate level of scrutiny." <u>GeorgiaCarry.Org v. Georgia</u>, 687 F.3d 1244, 1261 n. 34 (11th Cir. 2012). Applying

this test, the Eleventh Circuit has, for example, upheld a law preventing licensed gun owners from carrying firearms in places of worship unless they received permission management, as well as a regulation prohibiting the possession of firearms on Army Corps of Engineers property. See GeorgiaCarry.Org v. Georgia, 687 F.3d 1244 (11th Cir. 2012); GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs, 788 F.3d 1318, 1323 (11th Cir. 2015).

Because Plaintiffs are bringing an as applied challenge, the "restricted activity" in this case is Plaintiffs' practical inability to obtain a GWL during the pendency of the emergency. As aforementioned, a GWL is not required to possess a firearm in one's home, car, or place of business. O.C.G.A. § 16-11-126(a). In addition, unlicensed individuals may also carry in public (1) an unloaded or loaded long gun, provided any loaded long gun is carried openly, or (2) any handgun, provided it is enclosed in a case and unloaded. O.C.G.A. § 16-11-126(b), (c).

Georgia is currently under a shelter-in-place order. See Georgia Exec. Order 04.08.20.02 (April 8, 2020), https://gov.georgia.gov/document/2020-executive-order/04082002/download (extending shelter-in-place through April 30, 2020). At the TRO hearing, Plaintiff's counsel indicated that Plaintiff Carter

wishes to be armed when she exercises outside, goes grocery shopping, or needs to see a doctor.[14] Doc. No. [34], Tr. at 20:24–21:3. Under state law, Plaintiff Carter is free to carry her loaded firearm without a license at her home, in her car, and at her place of business.[15] Plaintiff Carter may also possess a loaded long gun without a license if carried openly and fully exposed. Likewise, Plaintiff Carter's right to carry a handgun outside of her home, car, or business is only curtailed to the extent that the handgun must be in a case and unloaded. Because all these options remain available to Plaintiff Carter, the inability to obtain a GWL during the limited pendency of the state of emergency "does not gut the plaintiff's

---

[14]     It remains unclear whether the grocery store or doctor's office Plaintiff Carter wishes to carry a weapon to allows firearms on the premises. As the Eleventh Circuit has held, "[a]n individual's right to bear arms as enshrined in the Second Amendment, whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land." GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1265 (11th Cir. 2012); see also O.C.G.A. § 16-11-126(d) "[P]rivate property owners or persons in legal control of private property through a lease, rental agreement, licensing agreement, contract, or any other agreement to control access to such private property shall have the right to exclude or eject a person who is in possession of a weapon or long gun on their private property . . . .").

[15]     Plaintiffs' counsel noted at the TRO hearing that Plaintiff Carter works in agriculture and is therefore an essential worker who is still reporting to her place of business.  Doc. No. [34], Tr. at 20:13–15.

general right to keep and bear arms in self-defense." GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs, 788 F.3d 1318, 1326 (11th Cir. 2015).

Because Plaintiffs cannot establish a general, unlimited Second Amendment right to bear arms in public,[16] and because options to carry publicly remain available to them, the Court holds they have not established a likelihood of success on the merits of their Second Amendment claim.[17]

### 2. Fourteenth Amendment Claim

Plaintiffs' Complaint does not clearly state whether they are bringing a substantive or procedural due process claim. The Complaint states: "By requiring a GWL in order to exercise a fundamental constitutional right, but making it a sheer impossibility to obtain a GWL, Kemp and Toomer are violating Carter's right to due process." Doc. No. [1], ¶ 43. Because Plaintiffs' Fourteenth Amendment count implicates the core of the Second Amendment constitutional

---

[16]     Plaintiffs cite to Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012) to support their contention that the Second Amendment encompasses a right to bear arms in public. Even if that case did acknowledge such a broad right, it is not binding on this Court.

[17]     As the Eleventh Circuit has noted, the Heller Court did not identify the applicable tier of constitutional scrutiny for Second Amendment claims. GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers, 788 F.3d 1318, 1323 (11th Cir. 2015). However, because Plaintiffs do not have a likelihood of success on their claim that the challenged restriction violates a protected Second Amendment right, the Court need not decide what level of scrutiny would apply.

right, the Court will construe it as a substantive due process claim. See Palko v. Connecticut, 302 U.S. 319, 325 (1937) (noting the substantive component of the clause protects those rights that are "fundamental," that is, rights that are "implicit in the concept of ordered liberty").

The Supreme Court has recognized only a limited number of substantive due process rights. See Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (noting that "in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the rights to marry; to have children; to direct the education and upbringing of one's children; to marital privacy; to use contraception; to bodily integrity; and to abortion"). The Court has instructed that, where the claimed substantive due process right "is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272, n.7 (1997) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)).

Thus, Plaintiffs cannot claim any broader protection of the right to bear arms by the Fourteenth Amendment than is afforded by the Second Amendment

28

itself. Because Plaintiffs do not have a likelihood of success on the merits of their Second Amendment claim, they lack a likelihood of success on the merits of their Fourteenth Amendment claim as well.

### B. Irreparable Injury

"[A] showing of irreparable injury is the sine qua non of injunctive relief." Siegel, 234 F.3d at 1176. Plaintiffs' counsel argued at the TRO hearing that because the Second Amendment provides a fundamental right, any alleged violation of it automatically constitutes an irreparable harm. Doc. No. [34], Tr. at 21:7–10; see also Doc. No. [3-1], p. 3 (arguing "[d]eprivation of fundamental constitutional rights causes per se irreparable harm"). Plaintiffs can point to no binding authority to support this argument.

A violation of the First Amendment satisfies the irreparable harm requirement without any further showing. See, e.g., Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); Cate v. Oldham, 707 F.2d 1176, 1188 (11th Cir. 1983) ("It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction."). However, this is not true of all

29

constitutional rights. <u>Siegel</u>, 234 F.3d at 1177–78 ("Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far, however."). Even if Plaintiffs were likely to succeed on their Second Amendment claim, neither the Eleventh Circuit nor the Supreme Court has held that the Second Amendment's protections are of the sort that, when violated, trigger a presumption of irreparable harm.

The Court finds that Plaintiffs will not be irreparably harmed for two reasons. First, as discussed *supra*, Plaintiffs retain lawful options for possessing weapons at home, in their cars, and even publicly without a GWL. Second, the state of emergency is temporary, and is currently set to expire on May 13, 2020. <u>See</u> Georgia Exec. Order 04.08.20.02 (April 8, 2020). There is nothing in the record to suggest that the probate judges will not resume processing GWL applications when the state of emergency is lifted, and it becomes safe to do so.

## C. **Balancing of the Harms**

Plaintiffs argue that while their harm is irreparable, "[t]he relief sought is not drastic." Doc. No. [3-1], p. 3. The Court disagrees. An order forcing the Governor to use his executive emergency powers to suspend enforcement of a

lawfully enacted criminal statute would, in fact, be a drastic one.[18]  Plaintiffs have

not cited to any case where a court has issued such an order.

Plaintiffs argue that "Defendants cannot seriously argue that they have any

interest in violating Plaintiffs' Second Amendment rights." Doc. No. [3-1], pp. 3–

4. However, clearly the state has a considerable public health interest in curtailing

normal activities to stop the exponential spread of a deadly virus. The state of

emergency caused by COVID-19 is largely unprecedented, and thus, case law

defining the balance between individual rights and the public health in such a

situation is scarce.

One case which is instructive is <u>Jacobson v. Massachusetts</u>, 197 U.S. 11

(1905). There, amid a smallpox outbreak, the City of Cambridge, acting pursuant

to a state statute, mandated the vaccination of all its citizens. The Supreme Court

upheld the mandatory vaccination, noting that

> the liberty secured by the Constitution of the United
> States to every person within its jurisdiction does not
> import an absolute right in each person to be, at all
> times and in all circumstances, wholly freed from

---

[18]     During oral argument, Plaintiffs' counsel argued that the Govenor does have the
power to suspend enforcement of provisions of the criminal code. He pointed to
Govenor Kemp's suspension of Georgia's anti-masking statute as evidence that the
same could be done for the GWL requirement. Doc. No. [34], Tr. at 14:13–20.

> restraint. There are manifold restraints to which every
> person is necessarily subject for the common good.

Id. at 26. However, "if a statute purporting to have been enacted to protect the

public health . . . has no real or substantial relation to those objects, or is, beyond

all question, a plain, palpable invasion of rights secured by the fundamental law,

it is the duty of the courts to so adjudge," thus upholding the Constitution. Id. at

30. Therefore, Jacobson instructs that, while states may exercise their inherent

authority to protect the public health in an emergency, the state action (1) must

bear a substantial relation to the public health objective, and (2) must not

constitute a "plain, palpable" invasion of a fundamental right.

Because Plaintiffs have failed to show a likelihood of success on the merits

of their Second Amendment claim, there is no "plain, palpable" invasion of any

fundamental right. Furthermore, the challenged action does bear a substantial

relation to the protection of the public health—GWL applications were

suspended because all non-essential court functions have been suspended so as

to enforce social distancing as much as is possible.

### D. Public Interest

Plaintiffs argue only that "[t]he public has a strong interest in seeing the

Constitution enforced as the supreme law of the land," and has no interest "in

32

violating the Second Amendment." Doc. No. [3-1], p. 4. This fails to address any interest the public has in seeing O.C.G.A. § 16-11-126 enforced. See Hertz v. Bennett, 294 Ga. 62, 67, 751 S.E.2d 90, 94 (2013) ("The goal [of O.C.G.A. § 16–11–129] is to protect the safety of individuals who are in public places, which has been identified as a substantial government interest."). Plaintiffs insist only "law abiding citizens" would be free to carry handguns in public. Doc. No. [3-1], p. 3. However, suspending O.C.G.A. § 16-11-126 would mean individuals who might not pass a GWL application investigation would be able to lawfully carry loaded handguns in public. Plaintiffs have not shown that the requested relief would not be injurious to the public interest.

## V.    CONCLUSION

The Court finds that Plaintiffs have failed to demonstrate standing to pursue their claims against Governor Kemp. The Court also holds that the allegations in Counts 1 and 2 of the Complaint, *as amended*, concerning violations of the Constitution of the State of Georgia by Governor Kemp, are barred by the Eleventh Amendment of the United States Constitution. Finally, the Court finds that Plaintiffs have not met their burden in establishing they are entitled to a TRO. Thus, Plaintiffs' Motion for TRO (Doc. No. [3]) is **DENIED**.

**IT IS SO ORDERED** this <u>20th</u> day of April, 2020.


<u>s/Steve C. Jones</u>
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**